UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


PENNY MATHEWS,                )
                                )
           Plaintiff,         )
                                )        1:09-cv-478-SEB-DML
       vs.                )
                                )
BRONGER MASONRY, INC.,     )
                                )
           Defendant.


**FINDINGS OF FACT AND
CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL**


       This matter came before the Court on December 13-14, 2010, to resolve Plaintiff

Penny Mathews's claims that Defendant Bronger Masonry, Inc. failed to pay her overtime

wages for personal and vacation time accrued over the course of her employment, and,

alternatively, an unpaid portion of her salary.  Ms. Mathews's claims were brought

pursuant to the Fair Labor Standards Act ("FLSA") and the Indiana Wage Payment

Statute, IND. CODE § 22-2-5 *et. al.*  For the reasons discussed below, we find Bronger

Masonry, Inc. <u>LIABLE</u> to Ms. Penny Mathews in the amount of $676.92 plus reasonable

attorney fees related to her claim for unpaid salary, pursuant to IND. CODE § 22-2-5-2.[1]

---

      [1]During post-trial briefing, Ms. Mathews requested two extensions of time to file
proposed findings of fact and conclusions of law and to file Plaintiff's reply brief in support of
her trial brief. [Docket Nos. 112 and 116].  These motions are hereby <u>GRANTED</u>.  Ms. Mathews
also filed an Unopposed Motion to Substitute Corrected Trial Brief. [Docket No. 114].  This
motion is also <u>GRANTED</u>.

## Findings of Fact

Defendant Bronger Masonry, Inc. ("Bronger") is an incorporated business with offices located in Boone County, Indiana.  Stip. ¶ 1.  Bronger is a masonry company that performs bricklaying services on construction projects.  Bronger is an employer pursuant to the FLSA and Indiana's Wage Payment Statute.  Stip. ¶¶ 5-6.

Ms. Mathews submitted her resume to Bronger through monster.com, an internet website designed to match employers with job applicants.  The position posted on monster.com was entitled "Office Manager," and was described with duties similar to positions Mathews had previously held at Duke Realty and two other construction companies.  Dwayne Bronger, President and owner of Bronger Masonry, contacted Ms. Mathews shortly thereafter to discuss the position generally.  During that discussion, Mr. Bronger provided Ms. Mathews with general information about the company, such as its size, typical projects, and revenue.  Ms. Mathews sought clarification that the position was based on a 40 hour work week and explained that, if hired, she would need some time off for an impending dental procedure.  This telephone discussion ended with an in-person interview scheduled for sometime during the first or second week of March, 2007.

Ms. Mathews's in-person interview took place at Bronger's office in Lebanon, Indiana, following which Ms. Mathews was hired and began working for Bronger on April 2, 2007.  Stip. ¶ 2.  Her employment there lasted approximately fifteen months, until July 29, 2008.  Stip. ¶ 3.  According to Ms. Mathews, the promised leave arrangements entitled her to 5 sick or personal days for the remainder of 2007 and to the

same allocation in 2008. She was also entitled to one week of vacation time during the remainder of 2007 and, beginning in 2008, she would be entitled to two weeks of vacation time. Thus, given the length of Ms. Mathews's employment at Bronger, she was entitled to a total of 25 sick, personal, or vacation days. Bronger did not require that any of these days off be used for any specific purpose, i.e. Ms. Mathews was not required to actually be "sick" in order to utilize her sick days.

During the period Ms. Mathews was employed at Bronger, the company employed both salaried and hourly employees. Ms. Mathews estimated that Bronger employed a total of between 30 and 90 union employees during her term of employment. Bronger did not pay its hourly employees for holidays, vacation days, or paid time off. Bronger also employed approximately four office employees, including Ms. Mathews, Mr. Bronger, a field superintendent, and an estimator. Mr. Bronger testified that each of these office employees, as well as one truck driver, was a salaried employee. Bronger paid its salaried employees for holidays as well as their allotted time off. Bronger had no way of tracking its salaried employees' days off. Rather, these employees were responsible for tracking their own days off in accordance with an "honor system."

Ms. Mathews began working for Bronger at a rate of compensation equal to $18.75 per hour, based upon a 40 hour work week. From the pay period beginning April 10, 2007 until the pay period ending October 29, 2007, Ms. Mathews was paid $750.00 without regard to whether she worked more or less than 40 hours per week. Over the course of Ms. Mathews's employment at Bronger, she received two pay raises. The first

occurred in October, 2007, and the second occurred in June, 2008.[2]  From the pay period

beginning October 30, 2007 and through the pay period ending June 2, 2008, Ms.

Mathews was paid $846.16, whether she worked more or less than 40 hours per week.[3]

From the pay period beginning June 3, 2008 and through the pay period ending July 28,

2008, Ms. Mathews was paid $902.16 per week.[4]  In sum, over the course of Ms.

Mathews's employment at Bronger, she was paid for the equivalent of eight hours of

work for every week day, regardless of her actual attendance, including holidays (with the

exception of the two instances noted above.)

     Mr. Bronger testified that Ms. Mathews's attendance record was on the whole

unacceptable, including that she often arrived late to work.  On January 8, 2008, Mr.

Bronger sent Ms. Mathews a letter informing her that she would be suspended for three

days without pay based on her pattern of poor attendance.  That suspension, however, was

---

[2]Ms. Mathews, as the employee responsible for working with Bronger's outside payroll company, initiated her second raise on her own, based on her understanding from her conversation with Mr. Bronger that she was to receive pay raises in conjunction with those given to Bronger's union workers.

[3]Ms. Mathews was paid only $507.70 on May 1, 2008, for the pay period beginning April 22, 2008 and ending April 28, 2008.  Stip. ¶ 63.  According to the parties' stipulations, Ms. Mathews was absent from work one day during that period, April 28, due to illness.  Stip. ¶ 88. Mr. Bronger testified that he performed the duties associated with payroll for that pay period because Ms. Mathews was absent April 29th through May 2nd.  Stip. ¶¶ 88-89.  Her April 29th absence was due to illness.  Stip. ¶ 88.  Ms. Mathews was absent the next three days in order to deal with "sewer issues at her home."  Stip. ¶ 89.  For that following pay period, Ms. Mathews's pay returned to the standard $846.16, despite her absences.  Stip. ¶ 64.

[4]Ms. Mathews was paid $90.22 on August 7, 2008, for the pay period beginning July 29, 2008 and ending August 4, 2008.  Stip. ¶ 77.  Ms. Mathews's last day at Bronger was July 29, and she worked only 4 hours that day.

not enforced.

In performing her assigned tasks, Ms. Mathews's utilized an accounting program called Quick Books. She also used Excel to create spreadsheets and a software program called Quantum which related to billings for government projects (this constituted the majority of Bronger's work). Most of information generated from these two programs was eventually put into Quick Books as well. Ms. Mathews's username for the Quick Books program was "Admin."

Ms. Mathews testified that she worked under the direction of Mr. Bronger, but that she had considerable discretion in the performance of her duties. She indicated that she tried to complete all of her tasks within the 40 hour work week but that she was not always able to do so. As indicated in the parties' stipulations and elaborated on in Ms. Mathews's testimony, Ms. Mathews's duties at Bronger included the following responsibilities: (1) processing account receivables; (2) processing accounts payable; (3) answering telephones; (4) calculating payroll timesheets; (5) submitting that payroll information to the payroll company; (6) preparing bid documents; (7) maintaining personnel files; (8) combining invoices relating to certain projects and running job costing reports based on that information; (9) tracking job costs; (10) collecting unpaid invoices from third parties; (11) monitoring employee use of company cellular phones; (12) processing of workers' compensation claims; (13) dealing with corporate insurance;(14) reconciling vendor accounts; (15) collecting information from QuickBooks and Excel spreadsheets for use in monthly financials; (16) reconciling bank statements at the request

of Bronger's outside accountants; (17) cleaning bathrooms and performing other janitorial duties; (18) purchasing office supplies; (19) working with Bronger's outside accountants; (20) assisting with union benefits; (21) managing capital assets; (22) working with the bank; (23) entering monthly general ledger journal entries; (24) setting up company email accounts; (25) processing company credit cards and expenses; (26) performing other administrative tasks, including faxing, filing, and copying.  Stip. ¶ 78.

At trial, Ms. Mathews elaborated on almost all of these duties.  For purposes of our ruling, the following details are relevant:

Payroll: Ms. Mathews's duty with regard to payroll was to collect timesheets from the Bronger employees and to put that information into a spreadsheet.  Mr. Bronger would review the spreadsheet, make any necessary changes, and return the sheet to Ms. Mathews to forward to the outside company that handled Bronger's payroll.

Preparing Bid Documents: With regard to preparing bid documents, Ms. Mathews's duty was to order plans for the projects and to enter Bronger's "standard" information, i.e. name of the company, address, etc., into the bid documents.  She highlighted non-standard portions of the documents for Mr. Bronger to complete.  Ms. Mathews estimated that, on average, it took her half of a day to prepare a set of bid documents.

Collecting Unpaid Invoices: Ms. Mathews ran a report showing past due accounts and telephoned those customers to inquire about the unpaid amounts.

Company Financials: Ms. Mathews did not prepare the company's year-end

financials.  Bronger employed an outside accounting firm for that purpose.  However, Ms. Mathews collected the company's financial information from QuickBooks and Excel for use by the accountants.  At one point, Bronger's accountants discovered a mistake in Bronger's reported cash account, after which discovery, the accountants directed Ms. Mathews to reconcile 16 months worth of prior bank statements.  Ms. Mathews explained that her process was to "undo" the bank reconciliation, to verify the correctness of the information within the statement by matching it up with the transactions recorded in QuickBooks, and, finally, to re-reconcile the statements.  Ms. Mathews explained that Bronger's accounting firm instructed her on how to complete this process.

Setting Up Company Email Accounts: At Mr. Bronger's direction, Ms. Mathews was responsible for moving Bronger's employees onto a "business-based" e-mail system under the Bronger domain name.  She contacted the company that Bronger used for their internet access and followed their instructions to set up those accounts.

Bronger's work week was Tuesday through Monday, and the employees were paid weekly.  When Ms. Mathews began working for Bronger in April, 2007, her daily work schedule, as set by Bronger, was supposed to be from 7:30 a.m. until 4:30 p.m.  However, as Ms. Mathews testified, her work day generally did not end before 6:30 p.m.  In May, 2007, Ms. Mathews requested that her work schedule be pushed back to begin at 8:30 a.m. and to end at 5:30 p.m.  However, Ms. Mathews testified that after May, 2007, she generally continued to work in the office until 6:30 p.m.  In addition, at some point prior to the weekend of May 25-26, 2007, Ms. Mathews began working from home, at times

continuing throughout the evenings and lasting into the very early morning hours. On September 18, 2007, she began concluding her work day by 6:00 p.m., having finished her work relating to the company's financials for that quarter. In March, 2008, the company hired Jessica Martin to perform some of the same duties assigned to Ms. Mathews, allowing Ms. Mathews's typical work schedule in the office to begin at 9 a.m. and run until 6 p.m. Although her daily lunch plans would vary, Ms. Mathews generally took 30 minutes each day for this break.

As referenced above, Bronger issued timesheets to employees which Ms. Mathews was responsible for combining into a spreadsheet for payroll purposes. When hourly employees submitted more or less than 40 hours per week, Ms. Mathews entered those amounts into the spreadsheet and, after Mr. Bronger reviewed it, submitted the form to Bronger's outside payroll company. For salaried employees, such as Mr. Bronger, the entry submitted to the payroll company was always 40 hours, regardless of whether the employee actually worked more or less than that. Ms. Mathews testified that she only kept timesheets for herself for the first three weeks she worked for Bronger because by then it had become clear that she would not receive overtime pay, whether she worked over 40 hours or not.[5] Thus, when Ms. Mathews completed the subsequent payroll spreadsheets for herself, she recorded only that she had worked 40 hours, regardless of

---

[5]Ms. Mathews testified that her first, second, and third week timesheets reflected 48, 45, and 45 hours, respectively. However, after Mr. Bronger told her that she would not receive overtime pay, she only submitted 40 hours to the company's payroll company on behalf herself.

whether she had actually worked more or fewer hours than that.

The parties stipulated to a total of 14 days that Ms. Mathews was absent from work. Stip. ¶¶ 79-89. In addition, Bronger submitted Ex. F-1, which records the times when Ms. Mathews made entries in Quick Books or sent email messages. By the Court's count, Ex. F-1 shows 25 days for which there is no electronic evidence that Ms. Mathews was working (in addition to the holidays and stipulated absences).

<u>**Conclusions of Law**</u>

Ms. Mathews claims that she regularly worked more than 40 hours per week and that Bronger's failure to pay her one and a half times her regular compensation for those hours was a violation of the Fair Labor Standards Act, 29 U.S.C. § 207 *et. seq.* She is also seeking recompense for other wages and unused accrued time off which she claims she is owed pursuant to Indiana's Wage Payment Statute, IND. CODE § 22-2-5 *et. seq.* Because our conclusion with regard to Ms. Mathews's FLSA claim bears on our discussion of her state law claim, we shall discuss that part of our analysis first.

**I. Ms. Mathews's Claim Pursuant to the Fair Labor Standards Act**

Pursuant to 29 U.S.C. § 207(a)(1) of the Fair Labor Standards Act:

> [n]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

As an initial matter, while the parties have stipulated that Bronger is an employer pursuant to the FLSA,[6] Bronger argues that Ms. Mathews failed to present any evidence on the issue of whether it is an "Enterprise engaged in commerce or in the production of goods for commerce," thereby failing to prove her prima facie case for a violation of the statute.

In applicable part, to fall under the statutory definition of an "Enterprise engaged in commerce or in the production of goods for commerce," an enterprise must:

> (i) ha[ve] employees engaged in commerce or in the production of goods for commerce, or [have] employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
> (ii) [be] an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated);

29 U.S.C. § 203(s)(1)(A). The record in this case is simply entirely of any direct evidence regarding Bronger's annual gross volume of sales or business. At trial, Ms. Mathews's counsel admitted that no discovery was pursued with regard to this required element because of the aforementioned admission by Bronger that it is an "employer" for purposes of the FLSA. But, as the statute clearly states and as the "Definitions" portion of that statute confirms, being an "employer" is not sufficient to establish liability. See e.g., Joles v. Johnson County Youth Serv. Bureau, 885 F. Supp. 1169, 1173-74 (S.D. Ind.

---

[6]The statute defines the word "Employer" to include, "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d).

1995)(finding that defendant was an employer pursuant to the FLSA but not an "enterprise engaged in commerce or in the production of goods for commerce"). Thus, we find Bronger's admission that it is an "employer" for purposes of the FLSA insufficient to support a finding that it is an "enterprise engaged in commerce or in the production of goods for commerce."

Ms. Mathews contends that there is evidence in the record from which the Court can infer that the annual gross sales made or business done of Bronger equaled or exceeded $500,000 annually. Specifically, she cites her testimony that Bronger employed between 30 and 90 union employees at any given time period in addition to at least three other office employees. Assuming an hourly wage of $10.00 without benefits (which Ms. Mathews claims is far less than the prevailing wage), Ms. Mathews asserts that yearly payroll for 34 employees would be $707,200.00. Thus, Ms. Mathews claims that the value of it services performed by Bronger annually can be inferred as more than $500,000. Bronger rejoins that such an inference is impermissible and that because Ms. Mathews has entirely failed to prove an element of her case at all (let alone failing to prove it by a preponderance of the evidence), Bronger cannot be held liable for an alleged violation of 29 U.S.C. 207(a)(1). Bronger's position on this issue is compelling but, because Ms. Mathews's FLSA claim fails for the other reasons as detailed below, we shall not address further whether such an inference would be permissible and reasonable.

Bronger argues that Ms. Mathews's FLSA claim fails because Ms. Mathews is exempt from the requirements of 29 U.S.C. § 207 by the so-called "administrative

11

exemption," specified in 29 U.S.C. § 213(a)(1). Although "[i]t is the employer's burden to establish that an employee is exempt from the FLSA's overtime requirements," Kennedy v. Commonwealth Edison Co., 410 F.3d 365, 370 (7th Cir. 2005), Bronger asserts that the evidence presented by Ms. Mathews at trial clearly established her exempt status.

The Department of Labor has promulgated relevant regulations which includes the following three-part test for determining whether an employee is exempted by that 29 U.S.C. § 213(a)(1):

(1)    The employee must be salaried and paid at least $455 per week;
(2)    The employee's primary duty must be the performance of office or non-manual work "directly related to the management of general business operations of the employer or the employer's customers;" and
(3)    The employee's primary duty must include "the exercise of discretion and independent judgment with respect to matters of significance."

29 C.F.R. § 541.200(a). Applying these criteria, we must agree with Bronger on this reason that Ms. Mathews's FLSA claim fails. We discuss each part of this test in greater detail below.

Whether Ms. Mathews was paid on a salary basis depends on whether she "regularly receive[]each pay period . . . a predetermined amount constituting all or part of [her] compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a) (2004)). "If an employer docks an employee's pay for partial day absences, violations of rules other than those of safety, or based on the quantity or quality of the employee's work, the employee

is not considered to be on a salary basis." Kennedy, 410 F.3d at 370 (quoting Piscione v. Ernst & Young, 171 F.3d 527, 534 (7th Cir. 1999)). However, an employee whose pay is docked because they were either "absent from work for one or more full days for personal reasons, other than sickness or disability" or "made in accordance with a bona fide plan, policy or practice of providing compensation for loss of salary occasioned by such sickness or disability" remains a salaried employee. 29 C.F.R. 541.602(b)(1-2).

It is clear to us that Ms. Mathews was a salaried employee as that term is defined by the regulations. With only two exceptions, Ms. Mathews was paid at a predetermined rate each week regardless of whether she worked more or less than 40 hours that week. Thus, the only way that Ms. Mathews can be considered an hourly employee is if she could establish that she should be treated as an hourly employee because Bronger's actions demonstrate that she was treated as such.

As Ms. Mathews points out, "[a]n employer who makes improper deductions from [an employee's] salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis. An actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis." 29 C.F.R. § 541.603(a). The factors to be considered when determining whether an employer had an "actual practice" of improper deductions includes "the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline." Id. Furthermore, the regulations state that "improper deductions that are either isolated or inadvertent will not result in loss of the exemption for any

13

employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions." 29 C.F.R. § 541.603(c).  Finally, nothing in the regulations regarding improper deductions is "to be construed in an unduly technical manner so as to defeat the exemption."  29 C.F.R. § 541.603(e).

As an initial matter, one of the two instances for which Ms. Mathews was paid on an hourly basis was for her final week of employment, when she had put in fewer than forty hours for that pay period.  The regulations specifically allow for such a practice and, thus, we need not consider further whether that instance was a basis for treating Ms. Mathews as an hourly employee. 29 C.F.R. 541.602(b)(6)("an employer is not required to pay the full salary in the initial or terminal week of employment").

The second instance for which Ms. Mathews was paid for less than her usual salary was for the pay period of April 22, 2008 through April 28, 2008.  As noted above, according to the parties' stipulations, Ms. Mathews was absent from work due to illness one day during that period, April 28, and was paid $507.70 for that period (as opposed to her usual $846.16/week).  Stip. ¶¶ 63, 88.  Assuming that Ms. Mathews's usual rate of $846.16 translates to $169.23 per day, it appears that her pay was docked for two days during this period.  The next week, Ms. Mathews pay returned to the usual $846.16, despite the fact that she missed four days of work during that pay period (one day for illness and the next three for "sewer issues at her home").  Stip. ¶¶ 88-89.

We find that this instance single instance does not establish an "actual practice" of improper deductions on the part of Bronger such that Ms. Mathews was or should be

treated as an hourly employee.  To the extent that the deduction might have been improper, the instance was isolated and Ms. Mathews was reimbursed in the following week for the two days for which she was not paid in the prior week.[7]  Thus, the deduction is clearly of the "isolated or inadvertent" type that 29 C.F.R. § 541.603(c) provides for. Moreover, as stated by the Seventh Circuit, "[i]dentifying a few random, isolated, and negligible deductions is not enough to show an actual practice or policy of treating as hourly the theoretically salaried."  Kennedy, 410 F.3d 365, 372 (7th Cir. 2005).  Given that Ms. Mathews has identified only a single incident that followed at least one infraction on the part of Ms. Mathews arguably warranting discipline, there is surely no basis for a finding that Bronger had "[a]n actual practice of making improper deductions demonstrat[ing] that [Bronger] did not intend to pay [Ms. Mathews] on a salary basis," pursuant to 29 C.F.R. § 541.603(a).

For these reasons, we hold that Ms. Mathews was a salaried employee and that she did not lose that status based on any improper pay deduction by Bronger.  Bronger has sufficiently established the first part of the three part test of the administrative exemption to the FLSA.  29 C.F.R. § 541.200(a).

---

[7]Ms. Mathews was paid her full salary even though she missed three days in the following pay period to handle personal affairs.  As stated in the regulations, "if an employee is absent for two full days to handle personal affairs, the employee's salaried status will not be affected if deductions are made from the salary for two full-day absences."  Thus, Bronger did not have to pay Ms. Mathews for those two days but did, effectively "reimbursing" her for any improper deduction from Ms. Mathews's pay during the previous period.  Treating the subsequent week's pay as a "reimbursement" is consistent with the express statement in 29 C.F.R. 541.603(e) that the regulation should not be "construed in an unduly technical manner."

Next, we conclude, based on Ms. Mathews's own testimony that the second and third elements of the administrative exemption have been established. Although Ms. Mathews correctly points out that the regulations provide that, "[t]he exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work," 29 C.F.R. § 541.202(e), they also do provide, "[a]n executive assistant or administrative assistant to a business owner or senior executive of a large business generally meets the duties requirements for the administrative exemption if such employee, without specific instructions or prescribed procedures, has been delegated authority regarding matters of significance." 29 C.F.R. § 541.203(d). As Office Manager, Ms. Mathews clearly had been delegated authority and discretion regarding matters of administrative significance, on which she worked with relatively little or no direct supervision.

Ms. Mathews was the sole clerical employee at Bronger until March, 2008, when another employee, Jessica Martin, was hired to assist her. Ms. Mathews testified that about 70% of her daily tasks could be described as "book-keeping" (90% of which consisted of "data entry"), 20% of her time was spent preparing bid documents, and 10% of her time was spent performing other, miscellaneous tasks. As we have noted previously, Ms. Mathews had considerable discretion in the performance of these duties. In addition, Ms. Mathews had a degree in Business Education and had performed similar duties for three former employers. She drew on this expertise to make certain processes

16

within the company "more efficient."  She acted as Bronger's representative in dealings with the company's outside accountants, its bank and third party vendors.  She had authority to stamp checks on behalf of the company in order to make needed purchases. Furthermore, Ms. Mathews performed her duties without direct supervision from Bronger or any other employee; indeed, her testimony reveals that she performed much of her work at home, sometimes even in the middle of the night.  Thus, we find that Ms. Mathews performed office work "directly related to the management of general business operations of the employer or the employer's customers" and exercised discretion and independent judgment with respect to matters of significance such that the second and third elements of the administrative exemption have been established.[8]

Because Bronger has carried its burden to show that Ms. Mathews was an administrative employee exempt from the provisions of 29 U.S.C. § 207, her claims for overtime pay pursuant to that statute fail.[9]

## II.    Ms. Mathews's Claims Pursuant to Indiana's Wage Payment Statute

---

[8]Prior to trial, Ms. Mathews requested that this Court reconsider its previous denial of her Motion for Partial Summary Judgment. [Docket No. 100].  Ms. Mathews argued that Bronger had failed to designate sufficient evidence to show that Ms. Mathews was an administrative employee exempt from the provisions of 29 U.S.C. § 207.   However, based on this ruling, we find that Bronger has not only created an issue of fact but, in fact, carried its burden of establishing that Ms. Mathews was an exempt employee, and Ms. Mathews's Motion for Reconsideration is DENIED.

[9]Ms. Mathews has also argued that to the extent that the Court finds that she is a salaried employee, then she "would be a salaried non-exempt employee who is eligible for overtime." Our decision regarding the application of the administrative exemption forecloses any finding that Ms. Mathews is "non-exempt" or that she can recover pursuant to 29 U.S.C. § 207.

Ms. Mathews has also brought three claims pursuant to Indiana Code § 22-2-5-1.

This section reads as follows:

> Every person, firm, corporation, limited liability company, or association,
> their trustees, lessees, or receivers appointed by any court, doing business in
> Indiana, shall pay each employee at least semimonthly or biweekly, if
> requested, the amount due the employee."

IND. CODE § 22-2-5-1.

In Hendershot v. Carey, the Indiana Court of Appeals determined that an employee was salaried "where the number of hours worked during a particular pay period did not affect the amount of money received in that paycheck."  616 N.E.2d 412, 420 (Ind. Ct. App. 1993).  As discussed above, with only two exceptions, Ms. Mathews's number of hours worked did not affect her payment.  Thus, Ms. Mathews must be considered a salaried employee for purposes of her Indiana Wage Payment Statute claims as well.

A.    Claim for Unpaid Hours Worked

Ms. Mathews claims that she is entitled to "unpaid regular hours," pursuant to IND. CODE § 22-2-5-1.  Ms. Mathews asserts that during weeks in which she was paid for a holiday or vacation/personal/sick day and clocked more than 40 hours (in spite of having that day off), she is entitled to be paid an amount greater than her salary.  Given our finding that Ms. Mathews was a salaried employee, the only amount "due" her would be her salary, regardless of her actual hours worked.  Thus, we find that no amount is due to Ms. Mathews for any hours worked and this claim fails.

B.    Claim for Unpaid Salary

18

In the event that the Court were to find that Ms. Mathews was a salaried exempt employee pursuant to the FLSA (which we have), she seeks repayment of the $338.46 which was the amount she was shorted from her regular salary for the pay period starting April 22, 2008 and ending April 28, 2008. Bronger rejoins that, if the pay period beginning April 22 were combined with the period beginning the subsequent week, Ms. Mathews was paid for 64 hours of work or eight days. Because Ms. Mathews has admitted that she only worked five days over the course of those two weeks, Bronger maintains that she was paid all sums due to her. We disagree with Bronger on this point.

As we explained above, we have determined that Ms. Mathews was a salaried employee. Thus, she was generally due her salary regardless of her attendance. Under Indiana law, "[a]ll deductions from wages constitute an assignment, which must meet specified statutory requirements." E & L Rental Equip. v. Bresland, 782 N.E.2d 1068, 1071 (Ind. Ct. App. 1003). Specifically, "to be valid, an assignment of wages must be in writing, signed by the employee, revocable at any time by the employee upon written notice to the employer, and agreed to in writing by the employer. An executed copy of the assignment must be delivered to the employer within ten days after its execution. Finally, the assignment must be made for one of the purposes described in IC 22-2-6-2(b) . . . ." Id. Bronger has not cited to any authority entitling him to dock Ms. Mathews's pay. In fact, Mr. Bronger admitted that he did not know why Ms. Mathews's pay was docked for the April 22nd pay period. Thus, that deduction was improper under Indiana law. Accordingly, we find that Ms. Mathews was "due" the $338.46 previously deducted from

her regular salary that Bronger paid her for the pay period starting April 22, 2008 and ending April 28, 2008.[10]

When an employer fails to make payment of wages in accordance with Indiana's Wage Payment Statute, the employer is also required to "pay to such employee for each day that the amount due to him remains unpaid ten percent (10%) of the amount due to him in addition thereto, not exceeding double the amount of wages due . . . ." IND. CODE § 22-2-5-2. Given the length of time that has passed since the improper wage deduction, we shall double the amount that Bronger owes Ms. Mathews, to wit, assessing a total of $676.92 as liquidated damages against Bronger. Ms. Mathews is also entitled to be awarded reasonable attorney's fees related to this claim pursuant to IND. CODE § 22-2-5-2. However, we emphasize that this award of reasonable attorney fees is limited to only this claim. Fees related to preparing and trying Ms. Mathews's FLSA or other Indiana Wage Payment statute claims are not permitted. See Novak v. Apollo Printing & Thermography, Inc., 562 N.E.2d 1305, 1307-08 (Ind. Ct. App. 1990).

C.     Claim for Unpaid Vacation/Personal/Sick Time

Ms. Mathews also claims that she is entitled to a total of sixteen unpaid vacation/personal/sick days that accrued during her tenure at Bronger. Under the Wage

---

[10]Our decision in this regard is not in conflict with our analysis above regarding whether Bronger had "[a]n actual practice of making improper deductions demonstrat[ing] that [Bronger] did not intend to pay [Ms. Mathews] on a salary basis" pursuant to 29 C.F.R. § 541.603(a). Although the fact that Bronger paid Ms. Mathews more than he was required (if Ms. Mathews was to remain a salaried employee) pursuant to the Code of Federal Regulations influenced our decision on that issue, it was not the sole basis on which we found that Bronger did not have an actual practice of making improper deductions.

Payment Statute, vacation pay constitutes deferred compensation, which is considered a "wage" and is, thus, subject to the provisions of that statute. Indiana Heart Assocs. v. Bahamonde, 714 N.E. 2d 309, 311 (Ind. Ct. App. 1999). "[A]n employee is entitled to her accrued vacation pay to the time of termination 'provided no agreement or published policy exists to the contrary' . . . ." Id. at 311-12 (citing Die & Mold, Inc. v. Western, 448 N.E.2d 44, 48 (Ind. Ct. App. 1983)). Because no evidence was presented at trial regarding any policy at Bronger related to unused accrued vacation pay, Ms. Mathews is entitled to such an amount only if she can prove that accrued vacation pay is actually warranted based on her attendance.

Based on the description of Ms. Mathews's allowed vacation/sick/personal days, we calculate that Ms. Mathews would have accrued 25 total days off over the tenure of her employment. According to the parties' stipulations, Ms. Mathews was absent from work 14 days. Stip. ¶¶ 79-89. Thus, at most, Ms. Mathews would be entitled to 11 days of unpaid vacation/personal/sick time that accrued during her tenure at Bronger. Bronger asserts that Ms. Mathews was absent many more days as evidenced both by Mr. Bronger's testimony and a letter sent to Ms. Mathews in January, 2008 referencing her "unacceptable" attendance record. Further, Defendant's Ex. F-1, reveals that there were several days for which a lack of electronic evidence suggests that Ms. Mathews did not work since no Quick Books entries were made by her and no emails were sent.

Our calculations reveal, based on Exhibit F-1, that 25 days (outside of holidays and absences already stipulated to) disclose no electronic evidence of Ms. Mathews

having worked.  While we are sympathetic to the possibility that Ms. Mathews may have over-generalized when she testified that she sent an email on each day she worked or that there may have been days she worked when she did not make entries in Quick Books, we are hard-pressed to believe that those two possibilities occurred simultaneously a total of 25 times.  Beyond Ms. Mathews's self-serving testimony that she missed work on only 14 days, the fact is that Ex. F-1 is the only evidence adduced which shows the specific days on which Ms. Mathews did or did not work.  Considering the tally of days missed by Ms. Mathews per Ex. F-1 along with Mr. Bronger's testimony about her unacceptable attendance record (corroborated by the January, 2008, letter regarding Ms. Mathews's persistent absenteeism (Ex. 10)), we conclude that Ms. Mathews had not accrued any unused vacation/personal/sick time by the end of her employment at Bronger.  Thus, she is not "due" any amount for that purpose, pursuant to IND. CODE § 22-2-5-1.

## Conclusion

For all the reasons detailed above, we conclude that Bronger Masonry, Inc. is LIABLE to Ms. Mathews in the amount of $676.92, plus reasonable attorney fees related to her claim for unpaid salary, pursuant to IND. CODE § 22-2-5-2.  Final judgment shall enter accordingly.[11]

IT IS SO ORDERED.

---

[11]After Ms. Mathews testified, Defendant moved for Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c). [Docket No. 108].  Because this ruling covers all the issues raised in that motion, Defendant's motion is GRANTED IN PART and DENIED IN PART in accordance with the findings and conclusions set out in this ruling.

Date:_____02/18/2011_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

23

Copies to:

Zachary Judson Eichel
EINTERZ & EINTERZ
zach@einterzlaw.com

Michael L. Einterz Jr.
EINTERZ & EINTERZ
michael@einterzlaw.com

Michael L. Einterz Sr.
EINTERZ & EINTERZ
einterzfirm@aol.com

Ronald E. Weldy
WELDY & ASSOCIATES
weldy@weldylaw.com